[No. 42755. En Banc. March 21, 1974.]

THE STATE OF WASHINGTON, *Petitioner*, v. GILES S. ODOM, *Respondent.*

Ronald L. Hendry, Prosecuting Attorney, and Joseph D. Mladinov, Special Counsel, for petitioner.

Betzendorfer & Deutcher, by Joseph Q. Betzendorfer, Jr., and Sterbick, Manza, Moceri, Gustafson & Narigi, by Richard I. Gustafson, for respondent (appointed counsel for appeal).

UTTER, J.—The State appeals from a judgment of the Court of Appeals reversing the defendant's conviction on one count of first-degree assault. That opinion in State v. Odom, 8 Wn. App. 180, 504 P.2d 1186 (1973), affirmed the defendant's conviction on three other counts of first-degree assault. We affirm the judgment of the Court of Appeals and adopt their reasoning on the issue whether there was sufficient evidence that three of the four counts of assault were committed "with intent to kill" the alleged victims.

The remaining issue, which requires further discussion, deals with the constitutional validity of the statutory presumption that when a defendant is charged with a crime of violence and is armed with an unlicensed pistol, it is prima facie evidence of his intent to commit such a crime of violence.

The necessary facts from which the jury could have determined the guilt of the defendant, as set forth in the Court of Appeals opinion, are:

[O]n November 24, 1970, the defendant went to the Tacoma offices of the Department of Employment Security to make his weekly report in support of his application for unemployment compensation benefits. While there, he objected to filling out a particular form and to reporting to the adjudication section. After having been told by the supervisor of benefits to complete the form and return with it the next week, and after having expressed his dissatisfaction with that procedure in an angry fashion, he left the office only to return within a half hour. Upon

his return, he approached the supervisor's desk, declared that he was tired of being pushed around, and announced an intention to settle this matter once and for all. At that time he was carrying a holstered .44 caliber magnum pistol in his left hand. He grasped the pistol in his right hand, pointed it at the supervisor and fired twice. On one occasion the projectile pierced through the supervisor's left lower chest, exiting to the right of the lumbar area of the spine. As a result of this gunshot wound, the supervisor suffered permanent paralysis of both lower extremities together with other permanent and incapacitating internal injuries.

After firing the pistol, he reloaded it, left the office by a rear exit and returned to his automobile in a nearby alley. In the meantime, police had been summoned. Two patrolmen approached in a "paddy wagon" and noticed the defendant sitting in his vehicle. The patrolman driver emerged from the police vehicle and the defendant fired at him. The patrolman returned the fire, and the defendant then fired at and into the windshield of the "paddy wagon" while the other patrolman was still sitting in the front seat. After a brief exchange of gunfire during which no one appears to have been hit by a projectile, the defendant ran down the alley and into another street, reloading his pistol as he ran.

At this point, a police lieutenant, driving a police prowl car, approached the defendant. The defendant pointed his pistol toward the windshield of the prowl car, but apparently did not fire the weapon. When the prowl car was approximately 25 feet from the defendant, the police lieutenant saw the gun pointed in his direction, and he believed Odom "was trying to kill me." He accelerated the vehicle and ran into the defendant, knocking him over and leaving him momentarily in a dazed condition. The lieutenant jumped out of the police car, approached the defendant from behind, and took the pistol from him. At that time the pistol was in a cocked position and was still loaded with two live rounds of ammunition. Before the gun was taken from the defendant, he said, "I've had enough," and after having been relieved of the gun, he addressed the lieutenant, "You son of a bitch, I wish I had shot you."

Mr. Odom purchased the gun in 1969. He applied for a permit to carry the weapon while he was working alone

late at night in a drive-in restaurant. His application was denied.

The defendant was arrested and subsequently was charged with having commited four counts of first-degree assault—each count alleging a separate victim which he has assaulted "with intent to kill." The victims were—the supervisor of benefits, the two patrolmen who had been in the "paddy wagon", and the lieutenant who had been in the prowl car.

The defendant assigned error to the giving of instruction No. 25, which reads:

You are instructed that under the laws of the State of Washington no person shall carry a pistol concealed on or about his person, except in his place of abode or place of business, without a license therefor.

You are futher instructed that in the trial of a person who has been charged with a crime of violence, the fact that the defendant was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit such crime of violence.

"Prima facie evidence" means evidence which may be accepted for proof of a particular fact. Such evidence even if not refuted by the defendant, should be given just such weight as it seems to you to merit.

He contends that the statute upon which this instruction is based deprives him of his presumption of innocence and allows the jury to convict him on proof of guilt less than beyond a reasonable doubt. RCW 9.41.030 provides: "In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit said crime of violence."

It is further urged that even if the statutory presumption is valid, the instruction improperly extends the use the jury may make of it.

The constitutionality of the statute in question has been affirmed in *State v. Person*, 56 Wn.2d 283, 352 P.2d 189, 81 A.L.R.2d 1088 (1960), and in *State v. Thomas*, 58 Wn.2d 746, 364 P.2d 930 (1961) as applied to first-degree assault. Statutory criminal presumptions in Washington have estab-

lished a prima facie case for the prosecution by allowing, but not requiring, the jury to infer the presumed fact from proof of the operative facts. *State v. Person, supra* at 288. There we stated, "the statutory presumption permits, but in no way directs, the jury to convict the accused, and must be considered by the jury in the light of the presumption of innocence which arises upon a plea of not guilty and accompanies the accused throughout the trial until overcome by evidence which convinces the jury of the accused's guilt beyond a reasonable doubt."

As for the statute in this case, we held in *State v. Thomas, supra* at page 748, that

> the statute does not make the possession of a pistol without a license evidence of the commission of crime, but evidence of intent. This inference of intent is, of course, rebuttable; but, more important, it is not conclusive even if no attempt is made to rebut it. It is sufficient evidence to take the case to the jury on the issue of intent, but the jury is not obligated to attach any weight to it. It considers it for what it may be worth.

The evidentiary effect of this presumption is that once the operative facts are proved and that presumption attaches, the case must go to the jury and there can be no directed verdict of acquittal.

Subsequent to our decisions in *Person* and *Thomas,* the United States Supreme Court expanded its development of the "rational connection" test. The previous test, stated in *Thomas* at page 747, was that "the fact proved must bear a rational connection to the ultimate fact presumed." We there required that our experience demonstrate that the fact presumed is usually and probably coexistent with the fact from which the presumption flows.

Substantial changes in the law have occurred since these opinions, which force a reexamination of our position taken in them and the other cases based upon them.

▮▮ Two theories, closely related, apply to the administration of the criminal laws of this state. The defendant is presumed innocent until proven guilty and his guilt must

be proved by competent evidence beyond a reasonable doubt. RCW 10.58.020; *In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). The presumption of innocence stresses that the jury is to consider in the material for their belief *"nothing but the evidence, i.e.,* no surmises based on the present situation of the accused." 9 J. Wigmore, *Evidence,* § 2511 at 407 (3d ed. 1940). The requirement of proof beyond a reasonable doubt has not only common law and statutory origins but also has been recently given constitutional stature in *Winship,* where the court stated, at page 364: "we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." The court described the reasonable doubt standard as a "prime instrument for reducing the risk of convictions resting on factual error." Its role in criminal prosecution was recognized as vital to an accused because "he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." The fact that in litigation there is always a margin of error was conceded by the court, and in recognition of this they held the reasonable doubt standard indispensible because it " 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' " *In re Winship, supra* at 363-64.

The apparent inconsistency between the newly emphasized standard of proof beyond a reasonable doubt and criminal presumptions has troubled many writers. Ashford & Risinger, *Presumptions, Assumptions, and Due Process in Criminal Cases: A Theoretical Overview,* 79 Yale L.J. 165 (1969); Note, *The Unconstitutionality of Statutory Criminal Presumptions,* 22 Stan. L. Rev. 341 (1970); Christie & Pye, *Presumptions and Assumptions in the Criminal Law: Another View,* Duke L.J. 919 (1970); Fuller & Urich, *An Analysis of the Constitutionality of Statutory Presumptions That Lessen the Burden of the Prosecution,* 25 U. Miami L. Rev. 420 (1971); Holland & Chamberlin, *Statutory Crimi-*

*nal Presumptions: Proof Beyond a Reasonable Doubt?*, 7 Val. U.L. Rev. 147 (1973). The United States Supreme Court recently has, as well, reevaluated its earlier approach to the validity of criminal presumptions in *Leary v. United States*, 395 U.S. 6, 23 L. Ed. 2d 57, 89 S. Ct. 1532 (1969) and *Turner v. United States*, 396 U.S. 398, 24 L. Ed. 2d 610, 90 S. Ct. 642 (1970).

In *Leary*, a presumption that one knew marijuana had been illegally imported from proof of its possession was struck down as failing the rational connection test. The court held, at page 45, that "it was incumbent upon the prosecution to demonstrate that the inference was permissible before the burden of coming forward could be placed upon the defendant." The court required that it should "at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Leary v. United States, supra* at 36.

The court also indicated an even stricter standard might be applied, at page 36, footnote 64, where it stated that inasmuch as the presumption was unconstitutional under the more-likely-than-not standard "we need not reach the question whether a criminal presumption which passes muster when so judged must also satisfy the criminal 'reasonable doubt' standard if proof of the crime charged or an essential element thereof depends upon its use."

In a later case, the court in *Turner*, at page 416, sustained a presumption which inferred knowledge of the unlawful importation of heroin from its unexplained possession by stating that it met both the more-likely-than-not standard and the reasonable-doubt test. The court likewise invalidated the same presumption as applied to cocaine, stating that it could not be sustained even under the "more-likely-than-not standard." Subsequent to *Leary* and *Turner*, many courts which have recognized the problem, have concluded that the beyond-a-reasonable-doubt test must be applied to find the rational relation to the presumed fact from the proved fact.

In *United States v. Johnson,* 433 F.2d 1160, 1168 (D.C. Cir. 1970), the court indicated that

> because proof beyond a reasonable doubt is itself an indispensible ingredient of due process in criminal cases, a rule of inference "which passes muster when so judged [by the more-likely-than-not standard] must also satisfy the criminal 'reasonable doubt' standard if proof of the crime charged or an essential element thereof depends upon its use." This latter, in such circumstances, imposes in turn the requirement that the inference authorized, standing alone, possess such potency that a jury could prudently accept it as proof of guilt to a moral certainty.

(Footnotes omitted.) In footnote 60, page 1168, it states: "This is but the normal judicial standard by which the trial judge appraises the sufficiency of the evidence to determine whether the case should be submitted to the jury . . ."

In *Wilbur v. Mullaney,* 473 F.2d 943, 948 (1st Cir. 1973), the court struck down a presumption that malice is presumed from an intentional killing, noting, that while a presumption "might, conceivably, be justified if based upon a fact which, if found beyond a reasonable doubt, also compels the inference beyond a reasonable doubt . . . no one could suggest such in this case."

The application by the United States Supreme Court of the beyond-a-reasonable-doubt standard as an alternative in *Leary* and *Turner,* and its subsequent application in *Johnson* and *Wilbur,* are persuasive to us that this is the appropriate standard to apply in this case.

The answer to whether it has been shown beyond a reasonable doubt in this case that the fact the defendant was armed with an unlicensed pistol proves his intent to commit a crime of violence can only be no. The facts in this case amply illustrate the failure of proof on this issue. The defendant purchased the gun 2 years before the crime was committed. He applied for a license, which was denied. He believed at that time that he needed the gun for self-protection while working as a night-time janitor. The failure to license a gun, standing alone, hardly can be said to

create an inference beyond a reasonable doubt of an intent to commit a crime of violence with that gun 2 years after the gun's purchase.

The prosecutor has presented, in his brief, statistics showing that of seven homicides by gun in 1971, six were with unlicensed guns; in 1972, that six homicides were by gun, all of them unlicensed and that to date in 1973, six homicides have been committed by gun with three of the guns unlicensed. These figures, while of interest, fail to show the necessary correlation between the proved fact and the presumed fact beyond a reasonable doubt and only serve to demonstrate the unsatisfactory methods which we use in dealing with the use of presumptions and problems of proof relative to them in criminal law.

In determining whether a requisite level of certainty exists, appellate courts depart from the traditional manner of proof in criminal cases. This introduces another area of uncertainty in the use of presumptions. The manner in which testimony is considered to determine the factual basis of presumption varies. In *State v. Thomas, supra,* the court looked to its own experience and legislative experience. In *Turner v. United States, supra,* the footnotes indicate many sources for expert testimony considered as evidence of the factual basis of presumptions. Among those sources were senate subcommittee hearings, presidential reports and reports from the Bureau of Narcotics. The testimony is considered by the court at the appellate level from briefs without cross-examination of its source. There is no opportunity to present defense witnesses to challenge the statistics' validity or for compulsory process to produce witnesses regarding the validity of the presumption. The standards, if any, for admission of this evidence for consideration are patently less stringent than for that introduced at a criminal trial.

The application of the beyond-a-reasonable-doubt test to establish the rational connection still does not solve the problems associated with the use of presumptions. The law still requires us, at the appellate level, on the basis of

inadequate data, to determine the validity of inferences better resolved at the trial level by the trier of fact.

Justice Black, in his dissent in *Turner*, at pages 428, 431, raises several constitutional objections to the use of presumptions. He believes presumptions violate the requirements of the Bill of Rights that the government "state and define specifically what it must prove in order to convict the defendant so that he can intelligently prepare to defend himself on each of the essential elements of the charge." He believes it undermines the defendant's right to trial by an impartial jury by having the trial judge, in effect tell the jury that Congress has "injected its own views and controls into the guilt-determining, fact-finding process . . ." He further believes they violated the right to counsel by diminishing counsel's ability to effectively perform his role and that they also violate the defendant's rights against self-incrimination.

■ The views of Justice Black in his dissent are not now the law of the land and legislatures still have the authority to create presumptions where the presumed fact follows beyond a reasonable doubt from the proven fact. If they find them unusable in light of the constitutional problems raised, they still may eliminate the presumed fact from the definition of the crime. Legislative latitude in this respect is essentially the legislature's sense of justice which has been the prime constitutional limitation on the use of the criminal sanction, where an offense has been related to the Bill of Rights' protection. Hart, *The Aims of the Criminal Law*, 23 Law and Contemporary Problems 401 (1958).

■■ The jury was entitled to find an intent to kill from the fact that the defendant fired at the victims in the first three counts. Although the instruction on the presumption was erroneous, we agree with the Court of Appeals that as to those three counts the mind of the average juror would not have found the prosecutor's case significantly less persuasive had the jury not utilized the statutory presumption as a basis to find in the defendant a specific intent to kill the alleged victims. The error was harmless.

*Schneble v. Florida,* 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056 (1972).

The same cannot be said for count 4. There was no shot fired at the intended victim and although this, in itself, is not determinative, the use of the presumption creates a doubt as to its effect on the jury to the extent we cannot say its use was harmless.

The judgment of the trial court is affirmed as to counts 1, 2 and 3 and reversed and remanded for a new trial as to count 4.

FINLEY, ROSELLINI, HUNTER, and WRIGHT, JJ., concur.

STAFFORD, J. (concurring in part and concurring in the result in part)—I concur in the first three counts. In the fourth count I concur only in the result.

Without question, in a criminal case there must be a "rational connection" between a fact proved and the ultimate fact legislatively presumed. *Leary v. United States,* 395 U.S. 6, 23 L. Ed. 2d 57, 89 S. Ct. 1532 (1969); *Turner v. United States,* 396 U.S. 398, 24 L. Ed. 2d 610, 90 S. Ct. 642 (1970). I agree with the majority's position that there is no "rational connection" between the fact that one is armed with an unlicensed pistol and an intent to commit a crime of violence. To this extent, then, I agree that the legislatively created presumption must fail and that instruction 25 based thereon was incorrect.

However, the majority appears to hold additionally that in a criminal case the "rational connection" must be proved beyond a reasonable doubt in *all* legislatively created presumptions. Such a holding is both unnecessary for the instant decision and much too sweeping in its scope. Thus, as to the last count, I concur only in the result.

BRACHTENBACH, J., concurs with STAFFORD, J.

HALE, C.J. (concurring in part; dissenting in part)—I find it unrational to presume that there exists no rational connection whatever between the possession of a concealed deadly weapon and its use in the commission of a murder.

It is a matter of common knowledge that, in most crimes committed with a pistol, the weapon remains concealed either upon the person or in a vehicle or in some close-by place until it is actually employed in the crime. The legislature, therefore, was constitutionally entitled to make these assumptions and to legislate upon the basis of them. That the Justices do not see the existence of a rational connection does not mean that the legislature could not see it, nor does it deprive the legislature of the power to presume its existence. Thus, the legislature, I think was well within its constitutional powers in enacting RCW 9.41.030 to declare that, when a person commits a crime of violence when armed with a pistol, the fact that he was unlicensed to carry it is prima facie evidence that he intended to commit the crime of violence.

The legislature, quite logically, I think, recognizes that there exists a direct rational connection between the carrying of a concealed—*i.e.,* unlicensed—firearm and its use in crimes of violence. But in doing so, this lays down no more than a rebuttable presumption, and the defendant is at liberty to present whatever explanations he may have for carrying a concealed unlicensed pistol immediately prior to using it in the commission of an act of violence. If one does not wish to be saddled with the presumption, he has a ready remedy: not to carry a concealed pistol. By declaring a rebuttable presumption, the statute simply adds to already existing sanctions one more legitimate sanction against the illegal carrying of a deadly weapon.

I would, therefore, affirm on all counts.

HAMILTON, J., concurs with HALE, C.J.

Petition for rehearing denied May 16, 1974.